IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| IN THE MATTER OF AN | ) | |
| APPLICATION FOR CRIMINAL | ) | |
| COMPLAINT AND ARREST | ) | |
| WARRANT FOR: | ) | |
| CANDACE MARIE CLAIBORNE | ) | Case No. |
| | ) | |
| | ) | |
| | ) | |
| | ) | **Filed Under Seal** |
| | ) | |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Kellie O'Brien, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a criminal complaint and arrest warrant charging Candace Marie Claiborne (hereinafter Claiborne) with making materially false statements to Federal Bureau of Investigation (FBI) agents, in violation of 18 U.S.C. § 1001, and with conspiring to obstruct an official proceeding, in violation of 18 U.S.C. § 1512(b), (c), and (k).

2. I am a Special Agent with the FBI, and have been since 1999. Since 2007, I have been assigned to the Washington Field Office, Counterintelligence Division, where I investigate offenses involving espionage and the unlawful retention or disclosure of classified information. Before 2007, I served in the Safe Streets Task Force investigating drug, weapons, and violent crime offenses.

3. I have training in the preparation, presentation, and service of criminal complaints and arrest and search warrants, and have been involved in the investigation of numerous types of offenses against the United States. I have executed arrest warrants and search warrants in previous cases.

4. The facts in this affidavit are based on my personal observations, my training and experience, and information obtained from other witnesses and law enforcement agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Claiborne violated 18 U.S.C. § 1001 (Making False Statements) and conspired with unindicted co-conspirators to violate 18 U.S.C. § 1512 (Obstruction of an Official Proceeding). I therefore make this affidavit in support of a criminal complaint and arrest warrant charging Claiborne with these offenses.

## JURISDICTION

6. As discussed more fully below, the investigation involves violations of, among other things, 18 U.S.C. §§ 1001 and 1512. These criminal violations were either begun or committed in Washington, D.C., where Claiborne resides, or were begun or committed overseas, out of the jurisdiction of any particular state or district. Furthermore, during all times relevant to the charges, Claiborne worked for the Department of State, which is based in Washington, D.C.

## PROBABLE CAUSE

**Relevant Parties**:

7. Candace Claiborne is a 60-year-old Office Management Specialist with the Department of State. She is a United States citizen, who resides and works in Washington, D.C. Claiborne has a bachelor's degree in criminal justice and law enforcement from the University of the District of Columbia. She joined the State Department in 1999, and has served in a variety of places, including Washington, D.C., Baghdad, Iraq, Beijing and Shanghai, China, and Khartoum, Sudan. According to State Department records, Claiborne has language proficiency in Arabic,

Mandarin Chinese, and Spanish. She currently works at the Department of State headquarters building in Washington, D.C. in the Office of Caucasus Affairs and Regional Conflicts. [redacted]. Claiborne has held a TOP SECRET security clearance since 1999. She resides at [redacted] [redacted] Washington, D.C.

8. [redacted], who is Co-Conspirator A, is [redacted]. He is a United States citizen, who currently lives in Los Angeles, California, though he previously lived [redacted]. Co-Conspirator A graduated from Salisbury University in Maryland with a major in fine arts. Co-Conspirator A lived in China from 2000 through 2005, and then again from approximately January 2012 through August 2013. During the latter stay, Co-Conspirator A studied fashion design at the Raffles Design Institute at Donghua University in Shanghai.

9. [redacted], who is Co-Conspirator B, is a Shanghai-based importer/exporter who runs a spa and restaurant in Shanghai. A citizen of the People's Republic of China (PRC), he has known and regularly communicated with Claiborne and Co-Conspirator A since at least 2007. Co-Conspirator B works closely with Co-Conspirator C (see next paragraph). Co-Conspirators B and C, both of whom are assessed to be agents of the PRC intelligence services (PRCIS), specifically the Shanghai State Security Bureau (SSSB), have provided Claiborne and Co-Conspirator A with numerous gifts since 2011.

10. [redacted], who is Co-Conspirator C, is a PRC citizen and an agent of the PRCIS. Co-Conspirator C works closely with Co-Conspirator B and has had frequent communications with both Claiborne and Co-Conspirator A since 2012.

**Brief Overview of Chinese Intelligence Roles and Terms**:

11. PRCIS is a general term that encompasses both the civilian and military components of Chinese intelligence programs. More specifically, civilian intelligence collection is handled by the Ministry of State Security (MSS). The MSS can be described as an institution similar to the FBI and the Central Intelligence Agency (CIA) combined under one intelligence directorate responsible for counter-intelligence, foreign intelligence, and political security. The MSS consists of a central ministry, provincial state security departments, and municipal state security bureaus, such as the Beijing State Security Bureau (BSSB) and the Shanghai State Security Bureau (SSSB).

12. Among other things, the MSS and its regional bureaus are concerned with identifying and influencing the foreign policy of other countries, including the United States. The MSS and its bureaus seek to obtain information on political, economic, and security policies that may affect China, foreign intelligence operations directed at China, and biographical profiles of foreign politicians and intelligence officers.

13. Additionally, the MSS and its bureaus are tasked with conducting clandestine and overt human source operations, of which the United States was, and continues to be, a principal target for the PRC's intelligence gathering. These operations use trained intelligence case officers, as well as non-professional collectors called "cut-outs" or "co-optees." A cut-out or co-optee is a mutually trusted person or mechanism used to create a compartment between members of an operation to enable them to pass material and/or messages securely. A cut-out or co-optee can operate under a variety of covers, posing as diplomats, journalists, academics, or business people both at home and abroad. These individuals are tasked with spotting, assessing, targeting, collecting, and running sources that have access to classified, open-source, proprietary, or sensitive

information that the government of the PRC can utilize for economic, political, or military decision-making or advantage.

14. The PRCIS source operations tend to originate inside China, where the PRCIS prefers to meet with its assets.[1] To facilitate continued meetings inside China, the PRCIS will arrange and/or pay for travel and expenses. The PRCIS is known to pay their sources not only in cash, but also through other means, including business considerations or other types of assistance within China.

**Overview of Claiborne's Positions at the State Department**:

15. Claiborne joined the State Department in 1999. Claiborne signed an Oath of Office that read, "I will support and defend the Constitution of the United States against all enemies foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God."

16. As required for her employment, Claiborne obtained a TOP SECRET security clearance in 1999. Claiborne has retained that clearance ever since.

17. Claiborne's first duty post with the State Department was the United States Embassy in Beijing, China. Before departing for China, Claiborne completed foreign language training in Mandarin Chinese at the Department of State's Foreign Service Institute (FSI) in Arlington, Virginia. Claiborne began working in Beijing in or around March 2000. There, she was an Office Management Specialist (OMS)[2] for the Economic Minister Counselor and for the

---

[1] Assets are people who agree to help a foreign intelligence service by providing information to that service in response to taskings from foreign intelligence officers or agents.

[2] Office Management Specialists are required, as a condition of employment, to obtain and maintain a TOP SECRET clearance. They provide office management and administrative support worldwide to senior U.S. diplomats and to various embassy sections. Among other things, they manage meeting calendars for senior

Security Engineering Center at the embassy. Claiborne's Beijing tour of duty concluded in or around June 2003.

18. Claiborne's next State Department posting was also in China, this time at the United States Consulate General in Shanghai. There, Claiborne served as the OMS to the Executive Assistant to the Consul General from approximately August 2003 through July 2005. Throughout Claiborne's tours of duty in both Beijing and Shanghai, Co-Conspirator A lived with her in China.

19. After China, Claiborne worked as an OMS to the Deputy Chief of Mission in Buenos Aires, Argentina from approximately 2005 through the summer of 2007, before returning to the United States to enroll in Arabic courses at the Department of State's FSI. Claiborne's next posting was in Baghdad, Iraq, where she worked as an OMS for the Political Affairs Section from approximately June 2008 through July 2009.

20. After Iraq, Claiborne returned to Beijing, China, where she worked at the United States Embassy as the OMS for the Minister Counselor for Public Affairs. Claiborne's third tour in China lasted from approximately November 2009 through November 2012. Starting in approximately January 2012, Co-Conspirator A lived with Claiborne in Beijing. Co-Conspirator A moved to Shanghai in approximately July 2012, staying there until August 2013.

21. From approximately November 2012 through June 2013, Claiborne rotated between stints at the Department of State headquarters in Washington, D.C., and roving OMS assignments in Libya and Morocco. Claiborne then began work at the United States Embassy in Khartoum, Sudan, where she worked as an OMS to the Deputy Chief of Mission. Claiborne remained in Sudan from approximately July 2013 through August 2015.

---

staff, prepare agendas and support materials for meetings, help ensure that classified information is properly secured, and edit and revise documents and reports prepared by diplomatic personnel.

22. From approximately August 2015 through February 2016, Claiborne took Spanish classes at FSI. During that time, Claiborne lived in temporary, State Department-funded housing. She moved out of that housing, and back into her permanent residence in Washington, D.C., on or about February 27, 2016. She has lived in Washington, D.C. since then.

23. Starting in approximately May 2016, and continuing to the present, Claiborne has worked as an OMS in the Office of Caucasus Affairs and Regional Conflicts at the State Department headquarters in Washington, D.C. Claiborne is responsible for providing a full range of administrative support to the Office Director, Deputy Director, and six action officers, as well as to the Organization for Security and Cooperation in Europe Minsk Group Co-Chair (ambassadorial rank).

**Claiborne's Knowledge of Co-Conspirators B and C's PRCIS Affiliation**:

24. As demonstrated below and in the timeline provided later in this affidavit, Claiborne's actions and words clearly evidenced her knowledge that Co-Conspirators B and C were agents affiliated with the PRCIS.

25. Claiborne, a State Department employee with a TOP SECRET clearance, received periodic counterintelligence trainings and briefings, including multiple times during her tenure in China. These briefings and trainings detailed Claiborne's obligations to complete a Foreign Contact Report after any unofficial contact with a person that she "knows or suspects is a member of a foreign intelligence agency." 12 FAM 262.1-b.[3]

---

[3] FAM stands for Foreign Affairs Manual. According to the State Department's website, the FAM and its related handbooks "are a single, comprehensive, and authoritative source for the Department's organization structures, policies, and procedures that govern the operations of the State Department, the Foreign Service, and when applicable, other federal agencies." https://fam.state.gov/

At least three times during her 2009 – 2012 tour of duty in Beijing, Claiborne signed acknowledgement forms stating that she fully understood her reporting requirements, as set forth in the FAM.

26. Yet, in May 2011, Claiborne, who was stationed in China, received a tasking from PRCIS agent Co-Conspirator B that she not only never reported as required, but agreed to undertake for Co-Conspirator B.

27. The tasking came just one month after PRCIS agent Co-Conspirator B wired almost $2,500 to Claiborne's bank account in the United States.[4] After wiring this sum, Co-Conspirator B asked Claiborne for information on internal United States government positions on matters of U.S. – Sino relations. More specifically, Co-Conspirator B inquired about the "internal evaluation of the fruits and consensus . . . made by the US government" from the U.S. – Sino Strategic Economic Dialogue that had just finished between representatives of the United States and Chinese governments. Co-Conspirator B also wanted information about what types of pressures the United States government planned to place on the Chinese government if certain expectations were unmet. Finally, he inquired about the "internal attitudes taken by the high-level American officials." Based on my training and experience, this is precisely the type of information that the PRCIS would be interested in.

28. When Claiborne answered with responsive, but publicly available information, Co-Conspirator B clarified, "What **they** are looking for is what they cannot find on Internet." (Emphasis added). Co-Conspirator B also, consistent with his PRCIS affiliation, emphasized caution in the mode of communication. He warned Claiborne, "If you find something next time don't send them by email bcs others also can catch it with Internet."[5] Co-Conspirator B instead offered to personally pick up any information Claiborne passed.

---

[4] As will be explained later, Claiborne was required by federal law to report this gift. She did not.

[5] There are many typos or grammatical errors in the email correspondence between the parties. To improve readability, I have not inserted [sic] after each one.

29. After Claiborne met PRCIS agent Co-Conspirator C in early 2012, Co-Conspirator C emailed her to arrange a meeting so that he could provide gifts for her and "feedback about our last talk." Later, when Claiborne was no longer in China and unable to meet face-to-face with Co-Conspirators B and C, she told Witness 1, who was friends with Co-Conspirator B, that she used a China-based social media application to communicate with "them, the China experts." Claiborne knew exactly who these "experts" were. As she confided to Co-Conspirator A, Co-Conspirators B and C were "spies."

30. Claiborne appeared motivated by the profitable nature of her information-sharing relationship with the PRCIS agents. As she noted in her journal, she could "Generate 20k in 1 year" working with PRCIS agent Co-Conspirator B. Claiborne, who repeatedly complained of financial woes, also wanted to help Co-Conspirator A, [redacted], pursue his overseas educational and career goals. But as Claiborne, Co-Conspirator A, Co-Conspirator B, and Co-Conspirator C were well aware, Claiborne's goals were unobtainable on her State Department salary alone. So by deliberately and unlawfully making herself beholden to PRCIS agents Co-Conspirators B and C, Claiborne obtained her wished-for financial desires.

31. Indeed, as shown in the summary below and in the timeline that follows, Claiborne, within just a few years, received tens of thousands of dollars in gifts and benefits, either directly or through Co-Conspirator A, from PRCIS agents Co-Conspirators B and C. On Claiborne's behalf and with her knowledge and consent, Co-Conspirators B and C paid for Co-Conspirator A's college tuition in China, his housing, and his domestic and international travel (including multiple trips to the United States from China), while supplying Co-Conspirator A with a generous monthly stipend. Because of Claiborne's value to them, PRCIS agents Co-Conspirators B and C were even willing to fly from Shanghai to Beijing just to retrieve Co-Conspirator A's passport so that Co-Conspirator C could help Co-Conspirator A obtain a residence permit in Shanghai. And when

Claiborne was stationed in Africa, Co-Conspirators B and C offered to either fly Claiborne to China to meet with them, or to arrange a vacation for Claiborne with them in a neighboring African country.

32. When Co-Conspirator A allegedly committed a serious crime in China, PRCIS agents Co-Conspirators B and C immediately intervened to prevent the police from investigating Co-Conspirator A. Such an extraordinary step, in a country like China, makes plain the influence that Co-Conspirators B and C had within the PRC government. Co-Conspirators B and C also paid for Co-Conspirator A's plane travel, arranged last minute, back to the United States.

33. Claiborne knew the consequences that would result from discovery of her illegal relationship with PRCIS agents Co-Conspirators B and C. And she was aware that the benefits she received from the relationship came at a steep cost. At one point, Claiborne, having second doubts about the relationship, fretted to Co-Conspirator A, "I really don't want my neck or your neck in a noose regarding another party/person that has made this possible for you." Later, Claiborne warned Co-Conspirator A, "I don't want them [Co-Conspirators B and C] to be involved in your every move and details . . . You'll understand one day."

34. Indeed, knowing the illegality of her actions, Claiborne actively concealed her relationship with PRCIS agents Co-Conspirators B and C from others, especially investigators at the State Department and the FBI. When she completed her background questionnaire in 2014 to renew her TOP SECRET clearance, Claiborne deliberately excluded any mention of Co-Conspirators B and C, even though truthful answers required disclosure of their names and identities. When a State Department investigator later interviewed Claiborne, she continued to falsely omit any reference to Co-Conspirators B and C. She also misled the investigator about Co-Conspirator A's travels, stating that his only trip abroad was to Africa. She withheld that Co-Conspirator A had lived in China for a year, studying at a school and living in housing paid for by

PRCIS agents Co-Conspirators B and C. The next day, Claiborne called Co-Conspirator A to make sure he knew that she had not disclosed anything to the investigator about his time in China.

35. Around the same time that this interview occurred, Claiborne was regularly communicating with PRCIS agent Co-Conspirator B about receiving additional benefits from him. Before Claiborne knew the date of her national security background investigation interview, she contacted Co-Conspirator B, asking him to wire $5,000 to her bank account. Co-Conspirator B agreed. But before the funds were transferred, Claiborne learned that her national security background investigation interview would be happening soon. Fearing that State Department investigators would learn of the transfer and become suspicious, she emailed Co-Conspirator B, telling him about her upcoming "security clearance interview" and asking him to put "everything on hold until that's cleared." After the interview, which involved many questions about Claiborne's foreign travels and contacts, Claiborne called Co-Conspirator B, telling him not to transfer the money because of her ongoing background check. Claiborne also made clear, on the phone and by email, that Co-Conspirator B should delete all correspondence with her about the $5,000.

36. Later, after Claiborne filed a complaint against the Customs and Border Patrol, the FBI conducted an interview of Claiborne. During the interview, FBI agents inquired about Claiborne's and Co-Conspirator A's time in China. Claiborne made a number of material misstatements to hide her relationship with PRCIS agents Co-Conspirators B and C, including about the many gifts and benefits that she and Co-Conspirator A had received from them. Just hours later, Claiborne surreptitiously called Co-Conspirator A from a phone booth located three floors below her office at the State Department. During that call, and during two other calls that day with Co-Conspirator A, Claiborne tried to corruptly persuade Co-Conspirator A to falsely recall the origin of educational benefits that he had received directly from PRCIS agents Co-

Conspirators B and C. She also warned Co-Conspirator A that they should "stay away from [China] for now."

37. The next day, under the guise of a birthday greeting, Claiborne instructed Co-Conspirator A, "[D]elete all email messages and contact information in your email and phone pertaining to [Co-Conspirators B and C] – I don't want any trouble going forward ok – please do this immediately!"

38. Months later, an ethnically Chinese FBI undercover agent posing as an MSS officer met Claiborne outside her home in Washington, D.C. It was dark outside and cold. The undercover agent, whom Claiborne had never before met, said he knew Co-Conspirators B and C. Based solely on that alleged connection, Claiborne invited him into her home, where they talked for almost 1.5 hours.[6]

39. As they talked, the undercover agent made explicitly clear that he worked for the MSS, and that Co-Conspirators B and C were affiliated with the SSSB, the MSS's Shanghai regional affiliate. Claiborne expressed no surprise at this news. The undercover agent also told Claiborne that she was one of the MSS's "highest regarded" friends.

40. The undercover agent expressed thanks to Claiborne on behalf of the "Ministry" for her past assistance, which "directly helped" the Ministry's work. Claiborne in no way denied providing past assistance to the Ministry. To the contrary, Claiborne, in explaining why she could not currently provide assistance, explained that "things are not the way they used to be."[7]

---

[6] As Claiborne later revealed to the undercover agent, her first impression on seeing him was, "Who's this strange Chinese man standing out in front of my [house]?"

[7] While Claiborne refused to accept the cash gift offered to her and declined to enter into a new information-sharing agreement, she entertained the undercover agent with tea and answered his questions, including telling him generally about her current State Department assignment.

41. Claiborne explained that in the United States, she had "to do security stuff all the time." She complained that she had been asked "just way too many questions" about her "travels" and her "foreign contacts." Claiborne reiterated her concern about her national security clearance investigation, stating that "they ask us about this kinda stuff . . . like your relationship with foreign governments."

42. When the undercover agent left, Claiborne smiled and waved goodbye, parting with him on friendly terms. When he asked Claiborne not to discuss their conversation with anyone, Claiborne readily agreed. Despite an unambiguous obligation to immediately report this approach by a professed PRCIS agent, Claiborne never reported it.[8]

**Claiborne Directly and Indirectly Received Tens of Thousands of Dollars of Benefits from PRCIS Agents Co-Conspirators B and C**:

43. It is unsurprising that Claiborne did not report the approach by the undercover agent, as it would expose to investigation the tens of thousands of dollars in gifts and benefits that she received from PRCIS agents Co-Conspirators B and C. Claiborne received these benefits both directly to her, and indirectly through cash and benefits provided to Co-Conspirator A with her acquiescence. All of these gifts and benefits stemmed from Claiborne's impermissible, unreported relationships with PRCIS agents.

44. Below is a summary chart of the known gifts that Claiborne received personally and through Co-Conspirator A.[9] Although some of these gifts triggered clear reporting obligations of which Claiborne was aware, she never reported any of them to the proper authorities.[10]

---

[8] As the FAM makes plain, failure to report such contacts can lead to administrative action against the employee, including revocation of the employee's security clearance, which for Claiborne, was a necessary condition of employment. 12 FAM 262.3-2.

[9] Each of these will be discussed further in the timeline that follows.

[10] In an interview with the FBI, Claiborne acknowledged awareness of a reporting requirement for gifts and benefits received from certain foreign nationals.

| **Gifts and Benefits from PRCIS Agents Co-Conspirators B and C** | **Month(s) Received** |
|---|---|
| Beads for Co-Conspirator A's commercial crafts | October 2010 |
| Cash for Claiborne - $2,480 | April 2011 |
| Cash for Claiborne - $580 | July 2011 |
| Slippers for Claiborne | August 2011 |
| New Year's gifts for Claiborne (type and amount undisclosed) | January 2012 |
| DVD and book for Claiborne | January 2012 |
| Dinner for Co-Conspirator A | February 2012 |
| Hotel in Yiwu, China for Co-Conspirator A | March 2012 |
| Airplane tickets for Co-Conspirator A and two of his friends from Beijing to Shanghai | May 2012 |
| Cash for Co-Conspirator A (amount unspecified) | July 2012 |
| Shanghai rental payments for Co-Conspirator A – one bedroom, fully furnished, and newly renovated | July 2012 – August 2013 |
| Fashion school tuition for Co-Conspirator A – registration fee plus three semesters at a total cost of 76,500 RMB[11] | July 2012 – August 2013 |
| Birthday dinner at fancy hotel for Co-Conspirator A and Claiborne | August 2012 |
| Chinese medicine for Co-Conspirator A | September 2012 |
| Sewing machine for Co-Conspirator A | October 2012 |
| Shaver for Co-Conspirator A | December 2012 |
| Apple iPhone for Claiborne | December 2012 |
| Cash for Co-Conspirator A (amount unspecified) | December 2012 |
| Apple MacBook (a type of laptop computer) for Claiborne | January 2013 |
| Medicine for Co-Conspirator A | February 2013 |
| Monthly stipend of 3,000 for Co-Conspirator A while he lived in Shanghai, China[12] | Exact months unclear, but possibly July 2012 – August 2013 |
| All-expenses paid vacation to Thailand for Co-Conspirator A | March 2013 |

[11] The renminbi, or "RMB," is the basic unit of currency for the People's Republic of China. It is also sometimes referred to as the yuan.

At the relevant time, 76,500 RMB converted to approximately $12,103.09. Historical conversion rates, applicable to the relevant timeframes, are used throughout this Affidavit.

[12] It is unclear whether this was in American or Chinese currency.

| | |
|---|---|
| Cash for Co-Conspirator A (amount unspecified) | April 2013 |
| Phone cards for Co-Conspirator A | May 2013 |
| Roundtrip airplane tickets from China to Washington, D.C. for Co-Conspirator A | June - July 2013 |
| One-way airplane ticket from China to Washington, D.C. for Co-Conspirator A | August 2013 |
| 1000 RMB[13] for Co-Conspirator A | January 2014 |
| 5000 RMB[14] for Co-Conspirator A | February 2014 |

45. Additionally, Claiborne requested, or Co-Conspirators B and C offered, additional gifts and benefits that, for different reasons, did not materialize. For example, in September 2015, shortly after meeting with PRCIS agent Co-Conspirator B in China, Claiborne, upon her return to the D.C. area, requested that Co-Conspirator B wire her $5,000. He agreed to do so, but before he wired the money, the Department of State interviewed Claiborne for her national security clearance reauthorization investigation. Afraid that the investigators would find suspicious a substantial wire transfer from China, Claiborne called Co-Conspirator B, asking him to withhold the payment and to delete any correspondence with her about it.

46. Moreover, Co-Conspirators B and C had committed to paying for Co-Conspirator A's full fashion school tuition in Shanghai. For the three-year program, including a final year abroad in Singapore or Australia, the total cost of tuition alone was 301,500 RMB, or approximately $47,442.04. And relatedly, Co-Conspirators B and C appeared ready to continue paying for Co-Conspirator A's apartment rental and his stipend of 3,000 RMB per month. The stipend alone, over the final two years of Co-Conspirator A's education, would have been 72,000 RMB, or approximately $11,744.74. Claiborne knew and approved of these payments. But for Co-Conspirator A's alleged commission of a serious crime in China, which necessitated his departure

[13] Approximately $165.40 USD.

[14] Approximately $826.31 USD.

from Shanghai, Co-Conspirators B and C were prepared to make these payments of tens of thousands of additional dollars as a benefit to Claiborne.

47. Co-Conspirator B and Co-Conspirator C also offered two vacations to Claiborne while she was stationed in Sudan. One involved an all-expenses paid trip to China, and the other was for a holiday in East Africa. After considering these offers, Claiborne declined them. Like with the gifts and benefits she did receive, however, Claiborne neither reported these offers nor her communications about them with PRCIS agents Co-Conspirators B and C.

48. All told, Claiborne, directly and through Co-Conspirator A, received tens of thousands of dollars in gifts and benefits. And Co-Conspirators B and C, with Claiborne's acquiescence, were prepared to provide tens of thousands of dollars more. Knowing these benefits came from PRCIS intelligence agents, Claiborne actively and illegally concealed her improper connections with Co-Conspirators B and C and the many ways that she and her family benefitted from those connections.

**Timeline of Claiborne's and Co-Conspirator A's Contacts with PRCIS Agents Co-Conspirators B and C, and Claiborne's Unlawful Efforts to Conceal Those Contacts**:

**2007 – 2009**

49. By at least 2007, Claiborne and Co-Conspirator A were well acquainted with PRCIS agent Co-Conspirator B.

50. On or about June 13, 2007, Claiborne asked Co-Conspirator B for help locating a job for Co-Conspirator A teaching English in China. Co-Conspirator A separately emailed Co-Conspirator B about the job request, explaining that he was 21 years old and graduating from college. Co-Conspirator B responded, telling Co-Conspirator A, "I remember you very well." Co-Conspirator B provided guidance about teaching in China, and added, "I will also check with my friends if any possibility to find a chance for you." The next day, Co-Conspirator B emailed Co-Conspirator A about a teaching position at the Smiling Star School in Shanghai.

51. On or about December 31, 2007, Claiborne emailed Co-Conspirator B saying that she wanted to quit her State Department job and move to China. Claiborne suggested she could work in China as a virtual assistant, and asked Co-Conspirator B for help. Claiborne also told Co-Conspirator B that she wanted Co-Conspirator A to study fashion design in China. The problem, according to Claiborne, was financial due to Co-Conspirator A's college debt. Claiborne inquired of Co-Conspirator B, "He needs a place to stay, and he needs possible airfare . . . any suggestions?"

52. Throughout 2008, Claiborne, Co-Conspirator A, and Co-Conspirator B continued communicating about possible employment opportunities for Co-Conspirator A in China.

53. In 2009, Claiborne received a Classified Security Awareness Briefing at the U.S. Embassy in Beijing, China. Covered in the training was Claiborne's reporting requirements under the FAM, including for contacts with foreign intelligence agents.

**2010 - 2011**

54. Twice during 2010, Claiborne, while stationed in Beijing, China, received a Counterintelligence Refresher Brief, after which she executed a form that "detailed [Claiborne's] obligations and responsibilities . . . to report all instances of . . . indications, beliefs, or suspicions that [she] . . . may be the target of a foreign intelligence service or other entity." In so doing, Claiborne affirmed that she fully understood "all of [her] reporting requirements, as described by the Counterintelligence Refresher Briefing and the FAM."

55. Starting in January 2010 and continuing through 2011, Co-Conspirator B and Co-Conspirator A exchanged numerous emails about art supplies that Co-Conspirator A requested from China. Included were requests for beads that Co-Conspirator A used in commercial products that he assembled.

56. In July 2010, Claiborne traveled to Shanghai, where she stayed at the JW Marriott. Claiborne and Co-Conspirator B took a photograph together during that visit.

57. In August 2010, Claiborne informed Co-Conspirator A that "funds are a little tight right now" and that she was "trying to recover from all the debt I accumulated when I went home."

58. On March 7, 2011, the Secretary of State issued a cable to employees of all U.S. embassies and consulates reminding them of their obligation to report gifts, over $350, from a foreign government.[15] Two days later, the U.S. Embassy in Beijing, China, provided additional notice to all embassy employees (including Claiborne) of this requirement, reminding them that the reporting requirement applied to both tangible and intangible gifts.

59. On April 11, 2011, just one month after receiving the reminder notifications above, Claiborne received $2,480 by wire into her USAA account. The wire originated from Delta Shipping Co. Ltd./Bank of China Hong Kong, and the memo line read, "For [Co-Conspirator B] Shanghai." The FBI assesses that PRCIS agent Co-Conspirator B instructed the Chinese entity listed above to have money wired from China to Claiborne's USAA account. Claiborne never reported this gift, in violation of federal law. See 5 U.S.C. § 7342 (requiring U.S. government employees to report gifts from agents of foreign governments, if the gifts were worth more than "minimal value," as prescribed by regulation). In 2011, "minimal value" was set at $350.

60. On or about May 10, 2011, a month after providing this reportable gift, PRCIS agent Co-Conspirator B tasked Claiborne by email with questions regarding the RMB exchange rate and the United States Government's response to the U.S.-Sino Strategic Economic Dialogue. The US-Sino Strategic Economic Dialogue is the framework for the top government leaders of the United States and China to discuss economic relations between both countries. In 2011, this meeting took place between May 9 – 10, 2011, and included U.S. Vice President Joe Biden and Chinese Vice Premier Wang Qishan, among the attendees. The United States Government's internal perspective on this dialogue would have been of considerable interest to the PRCIS.

[15] Such reminder cables were annually sent to overseas diplomatic personnel like Claiborne.

61. In that same email, Co-Conspirator B inquired about the "internal evaluation of the fruits and consensus of the Dialogue made by the US government." Co-Conspirator B further wanted to know, "What's US government's consideration concerning the extent and timetable of the increase in the value of RMB's exchange rate?" Regarding that increase, Co-Conspirator B asked what pressures the U.S. government would place on the Chinese government if U.S. expectations were not met. Finally, Co-Conspirator B tasked Claiborne with reporting about the "internal attitudes taken by the high-level American officials towards this issue?" Claiborne never reported this tasking.[16]

62. On or about May 18, 2011, Claiborne emailed Co-Conspirator B, asking, "Was that stuff I sent useful?" Co-Conspirator B responded, "It is useful but it is also on the Internet. What they are looking for is what they cannot find on the Internet. If you find something next time don't sent them by email bcs others also can catch in with Internet. If you hv finished I will come to pick them." Claiborne then replied, "Ok I understand. Well it jsut so happens what they wanted to know was public knowledge."

63. On or about May 26, 2011, Co-Conspirator B emailed Claiborne again, inquiring, "Do you finished the job I gave you last time?" Claiborne answered, "[Co-Conspirator B], most of that information was in the email I sent you. To tell you the truth, I really don't want to spend time on this kind of stuff. Everything takes time and one has to do a good expectable job when working for others. I'm sorry, I don't have the time or the energy." In reply, Co-Conspirator B wrote, "I was thinking that we can make some money together before I go to Italy. Anyhow, if you find some information you can still give me to try later."

[16] Years later, while carrying out a court-authorized search, FBI agents found these questions in a document on Claiborne's computer, followed by 19 pages of responsive materials.

64. On or about July 9, 2011, Claiborne informed Co-Conspirator A that she had lunch that day with Co-Conspirator B.

65. On or about July 11, 2011, Co-Conspirator B emailed Co-Conspirator A offering him an opportunity to work at Co-Conspirator B's spa after Co-Conspirator A got experience doing spa work on a cruise line (Co-Conspirator A later applied for, but did not receive, employment on a cruise line).

66. On or about July 13, 2011, Claiborne received a $580 wire into her USAA account from Delta Shipping Co Ltd./Bank of China. Again, the memo read, "For [Co-Conspirator B] Shanghai." The FBI assesses that Co-Conspirator B instructed the Chinese entity listed above to have money wired from China to Claiborne's USAA account. Claiborne, in violation of federal law, never reported this gift.

67. On or about August 31, 2011, Claiborne invited Co-Conspirator A to join her in China, suggesting that he could work in Co-Conspirator B's salon in Shanghai. On or about August 24, 2011, Claiborne requested that Co-Conspirator B send her more slippers because her feet were often cold.

68. On or about September 15, 2011, Claiborne, whose constant financial difficulties made her vulnerable to PRCIS agents, paid over $9,000 in back taxes, interest, and penalties in the District of Columbia.

69. On or about November 8, 2011, Co-Conspirator B emailed Co-Conspirator A, noting that Claiborne would return to the State Department on November 18. Travel records confirmed that Claiborne landed at Dulles Airport on the 18th.

70. On or about November 22, 2011, Co-Conspirator A wrote Co-Conspirator B, thanking him for beads he had purchased for Co-Conspirator A's jewelry business. Co-Conspirator A recognized that Co-Conspirator B "went through a lot of work and trouble" to help him.

**2012**

71. 2012 brought new developments. Co-Conspirator A moved to China in January to live with Claiborne, and Claiborne met PRCIS agent Co-Conspirator C. On or about January 13, 2012, Co-Conspirator C emailed Claiborne, saying, "There is some feedback about our last talk, which I think is positive . . . besides, I prepare new year gifts for you." Co-Conspirator C suggested they meet in Beijing, and asked Claiborne to tell Co-Conspirator A hello. Claiborne wrote back, "I'll see you soon."

72. On or about February 2, 2012, Co-Conspirator B informed Co-Conspirator A that he had lined up a job for him teaching English in Shanghai if Claiborne approved. A few days later, Co-Conspirator B and Co-Conspirator A dined together.

73. On or about February 7, 2012, Co-Conspirator A wrote Co-Conspirator B, lamenting that he could not pay his U.S. school loans because it was "impossible" for him "to keep a job." Two days later, Co-Conspirator A confessed that he was so in debt to his university that he was not even able to obtain a transcript from the school. Apparently, Co-Conspirator A needed a transcript from his U.S. university to apply for jobs in China. Co-Conspirator B advised Co-Conspirator A not to worry because he was "working on [Co-Conspirator A's] project." Co-Conspirator B said, "Give me some time to find a way."

74. On or about February 13, 2012, Claiborne received an email from a staff member at Raffles Design Institute in Shanghai, China. The email spelled out the various degree offerings, and explained that "[s]tudents are required to study in Shanghai in the first two years and transfer to Singapore or Australia to complete the third year." Each academic year consisted of four semesters, and the cost for the Fashion Design program was 25,000 RMB per semester for the first two years, then 50,000 RMB for each of the final two semesters in Singapore or Australia.

Combined with a 1500 RMB registration fee, total tuition cost for the program was 301,500 RMB.[17]

75. Claiborne forwarded the email to Co-Conspirator A the same day. He sent it to Co-Conspirator B, conceding that the cost of the program did "not sound possible" for him.

76. Still on that same day, Claiborne wrote Co-Conspirator A, "[W]hile I want you to go to school to fulfill your dream, I would like for you to enter the school on your own accord. This has added an additional level of stress in my life which is why I had a bad dream. There are some components to this situation that I have to work out on my own, but it is my feeling not to depend on others as you know. I really don't want my neck or your neck in a noose regarding another party/person that has made this possible for you . . . I would really appreciate if you would keep this between us . . . and not send a blast email to [Co-Conspirator B]."

77. Co-Conspirator A dismissed Claiborne's concerns, admonishing her to "stop worrying about owing [Co-Conspirator B]," and observing, "You have your[] [relationship] with [Co-Conspirator B] and I have mine." Co-Conspirator A concluded, "[Co-Conspirator B] is a valuable resource and him and whomever I meet here I will keep because I know that it takes support to push through to success."

78. Co-Conspirator A then immediately emailed Co-Conspirator B. "I want to speak on this matter and I appreciate if you keep it between the two of us. . . [Claiborne] is tired of her time in China but that is not the case for me. . . One moment [Claiborne] gives you the green light to help me. The next moment, she doesn't want you to move forward with helping me. . . I am coming to Shanghai. That is my choice, and that is my wish. Whether she agrees or not. . . I feel as a man that it is important to develop a relationship with you apart from [Claiborne] because you

[17] Approximately $47,442.04.

are extending your hand to help me. . . And in the future if there is anything that I can do to also help you or be of some support then no problem."

79. Co-Conspirator B responded, "I know [Claiborne] very well. . . I will try my best to convince [Claiborne] for your move to Shanghai. We are checking with the fashion school and the school for you to teach the English in the evening."

80. On or about February 27, 2012, Co-Conspirator B emailed Co-Conspirator A, "We hv checked with fashion school in Shanghai" about costs and housing. Co-Conspirator B confirmed that the first two years of study would be in Shanghai, followed by a third year in Singapore or Australia. Co-Conspirator B stated that Co-Conspirator A would also "hv to rent a apartment outside school" and register with the police to obtain a permit to live in Shanghai. Co-Conspirator B then asked Co-Conspirator A when Claiborne was leaving Beijing to go to Australia, writing, "I will try to meet her again when I will be in Beijing next month."

81. On or about March 27, 2012, Co-Conspirator A emailed Co-Conspirator B photos of his passport and visa. Co-Conspirator B responded, "Give me the train no and arrival station in shanghai so I can pick u in the station."

82. The next day, Co-Conspirator B wrote to Co-Conspirator A, "Your hotel in yiwu hv already booked. . . The room rate is RMB170 per night."[18] Co-Conspirator B also provided Co-Conspirator A's train itinerary, and said, "Hope the schedule will be ok for you." That same day, Co-Conspirator A emailed a friend saying that Co-Conspirator A would be staying at "my friend [Co-Conspirator B] house."

83. Co-Conspirator A emailed Co-Conspirator B on or about April 16, 2012, asking if he could stay at Co-Conspirator B's home on May 3. Co-Conspirator A said he lost his job, which was "bad timing" because he had two friends visiting between May 12 and 23. Co-Conspirator A

[18] Approximately $26.97.

continued, “I don’t want to ask so much of you and [Co-Conspirator C] but I want to take them at least one day to see Shanghai, if anything Pudong. If its possible you or [Co-Conspirator C] can spend time with us for the day. Any ways its always nice to see you two. If there is also anything you need me to do then please feel free to ask.” Co-Conspirator A acknowledged he was having financial difficulties because of the lost job.

84. On or about May 17, 2012, Co-Conspirator A emailed Co-Conspirator B copies of his two friends’ passports. That same day, Co-Conspirator B emailed Co-Conspirator C the roundtrip flight reservations between Beijing and Shanghai for Co-Conspirator A and his friends. The total value of the flights was 4290 RMB.[19]

85. On or about May 24, 2012, Co-Conspirator A emailed Claiborne and Co-Conspirator B about the costs for fashion school in Shanghai, which amounted to 26,500 RMB for the first semester.[20] The money was due on June 1, just eight days later. Regarding this payment, Co-Conspirator A pondered, “I don’t have any legitimate way of earning income right now so is this even possible? . . . I am open to suggestions.”

86. On or about June 4, 2012, Co-Conspirator B informed Claiborne, “I got ok for the scalar ship for [Co-Conspirator A]. Did you talk with him before you back to state.[21] When you prefer to let him come to Shanghai. Time is very limited.”

87. Also on or about June 4, Co-Conspirator C emailed Co-Conspirator A, “Hey, [Co-Conspirator A]! How are you! [Co-Conspirator B] has informed me a couple of days ago that you might be considering starting school this July. I think according to our last visit to the school, you need to apply this month. Are you still up to something in BJ or you are planning to move to SH

[19] Approximately $678.72.

[20] Approximately $4,186.08.

[21] Claiborne traveled from Beijing to Washington Dulles Airport on or about May 28, 2012.

soon. It's usually difficult to start a new life in a new city, but I think [Co-Conspirator B] and me are willing to give our help. If the first batch of money is your concern, pls don't worry about that and we will give the first kick. Should you have any question or request, pls feel free to let us know." Co-Conspirator A responded, "Thank you [Co-Conspirator C]. I will proceed to apply to the school. . . Thank you for your assistance."

88. On or about June 7, 2012, Co-Conspirator A emailed Co-Conspirator B, Co-Conspirator C, and Claiborne to confirm arrangements for his pending visit to Shanghai. The next day, Co-Conspirator B confirmed with Co-Conspirator A that Co-Conspirator C would pick him up from the train station, and that the three of them would take him apartment hunting.

89. Co-Conspirator A wrote to family members on or about June 13 that he was preparing to "transition from Beijing to Shanghai next month to begin my studies in Fashion Design at Raffles Design School, Donghua University." Co-Conspirator A characterized the university as the "most renowned school in China for design." The program called for "two years in China, and one year in Singapore or Australia."

90. On or about June 20, Co-Conspirator C emailed Co-Conspirator A, copying Claiborne and Co-Conspirator B, writing, "Hey, [Co-Conspirator A]! Nice to get your call. And I have good news for you too. I find an apartment suitable for you. It is a one bedroom, one living room flat, bigger than the one you saw that day. It is newly renovated, fully equipped. Pls check out the attached pics. And it is 10 mins walk from the school. I am going to sign the contract tmr. As long as the contract is signed, I will proceed with the residence permit. Maybe you will need to come down to SH, maybe I will fly to BJ to get your passport. We will see what is the best. As I told you this afternoon, I have got all the document from the school. I will hand them to you when we meet."

91. On or about June 28, 2012, Claiborne returned to Beijing from Washington, D.C. The next day, Co-Conspirator A told Co-Conspirators B and C, "[Claiborne] is back safe, and is resting now. . . [Co-Conspirator B] I look forward to meeting Tuesday. I will let [Claiborne] know. . . I'm excited to move to Shanghai. . . Thank you so much [Co-Conspirator B] and [Co-Conspirator C] for your help!"

92. On or about July 10, 2012, Claiborne informed Co-Conspirator A that she was meeting Co-Conspirator B the next day. Three days later, Co-Conspirator C emailed Co-Conspirator A to check on him, letting him know that "should you need anything, please let me or [Co-Conspirator B] know." Co-Conspirator A wrote back, elaborating on the expenses he anticipated occurring to satisfy his course requirements.

93. On or about July 22 and 23, Co-Conspirator C and Co-Conspirator A communicated about a time to meet that week. The next day, Co-Conspirator A wrote to Co-Conspirator C, "Thank you for the money," indicating he had just purchased a phone with it.

94. On or about August 17 through 19, 2012, Claiborne stayed at a Marriott hotel in Shanghai. The $420.10 bill was paid in cash.

95. On or about August 21, Co-Conspirator A emailed Co-Conspirator B, Co-Conspirator C, and Claiborne to thank them for a "wonderful birthday around Shanghai." As Co-Conspirator A explained to his sister, he went on his birthday to "some fancy hotel terrace to relax the night away overlooking the famous river and financial district of Shanghai." Co-Conspirator B sent Co-Conspirator A and Claiborne photos of the three of them together at the birthday celebration.

96. On or about September 10, 2012, Co-Conspirator A told Co-Conspirators B and C that he would be opening a bank account that week. He also noted his lack of funds and referenced

Claiborne, who was "always stressing" about sending Co-Conspirator A money. Co-Conspirator A acknowledged that "[i]nternational trips are out because they are costly."

97. That same day, Co-Conspirator C wrote back to Co-Conspirator A to alleviate his concerns. "As for the money, I don't think there is an urgent need to make money for your stay in SH. I understand that you want to be financially independent, but as I have explained, at least for the first year, you should focus on the school. Me and [Co-Conspirator B] will try our best to cover the expenses."

98. On or about September 15, 2012, Claiborne emailed [redacted], warning them of the dangers of Facebook (people can collect intelligence and personal information about you), and notifying them that she was deleting her Facebook account. Claiborne separately reminded Co-Conspirator A to inform Co-Conspirator B that Co-Conspirator A would be traveling soon. On or about September 19, Co-Conspirator A departed China for a trip to Latin America. He returned to Shanghai on or about October10.

99. Claiborne visited Shanghai from October 18 through 21, staying at a Marriott hotel. The $722.90 bill was paid in cash.

100. On or about October 29 and again on November 1, Co-Conspirator A emailed Co-Conspirator B requesting a sewing machine. Co-Conspirator A sent a web link to Co-Conspirator B for the machine.

101. On or about November 26, 2012, Claiborne completed an Exit Interview Form supplied by the U.S. Embassy Regional Security Office in Beijing, China. Under the heading Foreign National Contacts, Claiborne listed "None." Under the heading Any Other Unusual Incidents or Anomalies to Report, Claiborne observed seeing an "Asian man standing at the south gate every day at 12:00 – 1:00 lunchtime." Claiborne mentioned nothing about her contacts with

PRCIS agents Co-Conspirators B and C, including the May 2011 tasking or the various gifts and benefits that they had provided to Claiborne and Co-Conspirator A.

102. Claiborne visited Shanghai again between on or about November 30 through December 2. She stayed at a Marriott hotel. The $308.80 bill was paid in cash.

103. On or about December 5, Claiborne returned to Washington, D.C. The next day, Co-Conspirator A sent Co-Conspirator B an email entitled "clippers," with a web link to the clippers he wanted.

104. On or about December 9, Claiborne forwarded Co-Conspirator B an email from Co-Conspirator A with a web link for a shaver. Claiborne wrote, "Can u get this for [Co-Conspirator A] along with the proper transformer?" Co-Conspirator B responded, "I hv order similar shaver for [Co-Conspirator A] on taobao.[22] No need transformer." Claiborne replied, thanking Co-Conspirator B. She then added Co-Conspirator C to the email chain, asking if Co-Conspirator B or Co-Conspirator C knew the serial number to the Apple iPhone that Co-Conspirator C purchased for her in China.

105. On or about December 11, 2012, Co-Conspirator B wrote Claiborne that Co-Conspirator A had "open[ed] the bank account already. We are going to pay for his third semester cost this weekend."

106. On or about December 27, 2012, Co-Conspirator A emailed Co-Conspirator B, saying, "I saw [Co-Conspirator C] today at Starbucks so we had a good talk. . . [Co-Conspirator C] says you will have someone deposit money into the account."

**<u>2013</u>**

107. On or about January 22, 2013, Claiborne asked Co-Conspirator B whether there was a password for the Microsoft Office program on her "apple notebook," indicating that Co-

---

[22] Taobao is a Chinese online shopping site.

Conspirators B and C had purchased an Apple laptop computer for her. Co-Conspirator B responded that to use Microsoft Office, Claiborne, who was no longer in China, would have to order the program over the Internet and pay for it.

108. On or about February 17, 2013, Claiborne told Co-Conspirator B that Co-Conspirator A was short on cash, and requested that Co-Conspirator B help him out. Co-Conspirator B seemed perplexed, responding that he had just transferred 3,000 to Co-Conspirator A on February 1.[23]

109. Claiborne and Co-Conspirator B also discussed a job opening in Hong Kong, which Claiborne said 17 other people had already bid for. Claiborne then informed Co-Conspirator B that Co-Conspirator A "would like to go to Thailand during the 2 week break. What do you think?"

110. On or about February 24, 2013, Co-Conspirator A fretted to Claiborne about his dismal work prospects in China and his dependence on others, asserting, "I don't always want to ask you [Co-Conspirator B] or [Co-Conspirator C] for money. I'm 27 and it bothers me." Co-Conspirator A, who had already told Co-Conspirator B and Co-Conspirator C that he could not afford international trips, told Claiborne the same thing. Co-Conspirator A further observed that it was "high season" in Thailand, making travel there even more expensive, and thus impractical.

111. In response to Co-Conspirator A's frustrations, Claiborne contacted Co-Conspirator B for help. With the subject line "We need to talk," Claiborne wrote, "He [Co-Conspirator A] needs to get away for his 2 week break but he doesn't want to ask for help. . . I think it would be good if he could go home for that time . . . it will do him good. Is there some way you can make that happen? . . . Can we schedule a time to talk on skype?"

[23] It is unclear whether the 3,000 was in USD or RMB. If the latter, it would have converted to approximately $484.65.

112. Regarding finances for Co-Conspirator A's education, Co-Conspirator B responded, "We apply the scholarship for three years. It is really a big job for us." Co-Conspirator B emphasized the need for Co-Conspirator A to focus on his studies and not worry about employment yet. He also expressed concern about Co-Conspirator A traveling to the United States since he already planned to travel to Thailand with friends during his school break, and had asked Co-Conspirator B to find cheaper tickets for him. Co-Conspirator B asked, "Do you think he will like to back home i/o to hv a long holiday in Thailand?"

113. On or about February 27, 2013, Claiborne emailed Co-Conspirator A, "So [Co-Conspirator B] said he was getting u a ticket . . . did u have a discussion?"

114. On or about February 28, Co-Conspirator C wrote to Claiborne, requesting guidance and providing assurance. He said he had just spoken with Co-Conspirator A, who was preparing a trip to Thailand. However, Co-Conspirator C knew that Claiborne wanted Co-Conspirator A to spend his break in the United States. Co-Conspirator C asked Claiborne which option she preferred, stating he would "only follow YOUR decision . . . [s]o I am asking you to confirm where he should spend his two-week break." Regarding travel arrangements, Co-Conspirator C assured Claiborne that "Me and [Co-Conspirator B] will see what we can do." Co-Conspirator C went on to say, referring to Co-Conspirator B and himself and recalling a similar conversation he recently had with Claiborne in Shanghai, that "our duty is to make sure [Co-Conspirator A] is focused on his study, not anything else, and other than tuition and rental, we can provide some pocket money for his basic needs." Regarding upcoming costs, Co-Conspirator C wrote, "we have to prepare well for his last year's study, which is overseas and much more costly. So please don't worry, you have our word."

115. Claiborne replied that day. She approved Co-Conspirator A's trip to Thailand. She also informed Co-Conspirator C that she would be doing a temporary duty assignment in Morocco,

and that she had applied for a job at the Consulate General in Hong Kong. Claiborne provided Co-Conspirator C with the name of the new Consulate General for Hong Kong, who, according to Claiborne, would be starting in late summer.

116. On or about March 7, 2013, Co-Conspirator A emailed Co-Conspirator B a copy of his passport.

117. On or about March 14, 2013, Co-Conspirator B informed Claiborne, "WE HV TRANSFER 4K TO [Co-Conspirator A] FOR HIS HOLIDAY+ROUND TRIP TICKETS TO BANKOK."[24] Co-Conspirator B made clear that he and Co-Conspirator C knew Co-Conspirator A's Industrial and Commercial Bank of China (ICBC) account information, including the account number.

118. On or about March 18, 2013, Claiborne told Co-Conspirator B and Co-Conspirator C that she did not get the job in Hong Kong. She also requested large calligraphy hangers, adding, "I am willing to pay for them."

119. On or about April 6, 2013, Co-Conspirator C emailed Co-Conspirator A, "Rental and tuition have been taken care of." Co-Conspirator A wrote back the next day, asking Co-Conspirator C to "check with [Co-Conspirator B] to see if he can put some funds in my account. I feel bad but I dint have any money." Co-Conspirator C responded on April 9, requesting a meeting with Co-Conspirator A at Co-Conspirator A's apartment. "Money will be delivered then and there are some other things we need to discuss with you." Co-Conspirator A agreed to the meeting.

120. On or about May 2, 2013, Co-Conspirator A wrote to Co-Conspirators B and C. Co-Conspirator A discussed his work schedule at Co-Conspirator B's restaurant. He also said he would go to the fabric market after he received his monthly allowance from Co-Conspirators B

[24] The currency is unclear.

and C. Co-Conspirator A thanked Co-Conspirator C for some cards,[25] and inquired whether it would be possible for him to visit Tibet.

121. On or about May 26, Co-Conspirator A wrote a lengthy email to Co-Conspirators B and C complaining about the challenges of working both at Co-Conspirator B's restaurant and attending school. He said, "I know it was part of the deal to receive the monetary incentive of 3000 if I work at the restaurant but I may have to do without the 3000."

122. On or about June 10, Claiborne admonished Co-Conspirator A for his behavior, reminding him that "you are in China . . . and you are there on someone else's dime . . . and because of someone else's sacrifices . . . so think twice . . . about your actions." Claiborne made clear that "[Co-Conspirator B/ Co-Conspirator C] are responsible for you while you are in the country."

123. On or about June 15, 2013, Co-Conspirator A asked Co-Conspirator B if he knew the confirmation number for Co-Conspirator A's upcoming flight. Two days later, Co-Conspirator A left China for Washington, D.C., returning to Shanghai on July 7.

124. Meanwhile, on or about June 16, 2013, Co-Conspirator A emailed Claiborne that he had "ran out of the moneh." Regarding Co-Conspirator A's need to obtain his Delta Airlines confirmation number from Co-Conspirator B, Claiborne inquired, "Did u ask [Co-Conspirator C]?", making clear that she knew that Co-Conspirators B and C purchased Co-Conspirator A's roundtrip plane ticket to Washington, D.C.

125. In August 2013, Co-Conspirator A's time in Shanghai came to an abrupt end after he allegedly committed a serious crime in China.

126. On or about August 6, 2013, Co-Conspirator A emailed Co-Conspirators B and C. He worried that China would prohibit him from ever returning to the country. Co-Conspirator A apologized, writing, "I can not imagine what you all are going through because youve already done

[25] Co-Conspirator A said, "They seem to be like phone cards."

so much to help and try to stabilize my life." Co-Conspirator B responded, telling Co-Conspirator A that he had "already bought the tickets" for Co-Conspirator A to fly home to the United States on August 10.

127. On or about August 7, 2013, Claiborne forwarded to Co-Conspirator A an email that appears to have been addressed from Co-Conspirator C to her. It indicated that Co-Conspirator A had committed a possible "felony" offense.

128. Co-Conspirator C continued, "We made some efforts and the police agrees that they won't come after [Co-Conspirator A] but there is no way to keep the student visa. As you may know, the given deadline of leaving the country is next Monday. [Co-Conspirator B] will arrange a flight for him to go back to the States."

129. Also on or about August 7, Claiborne asked Co-Conspirator B whether the payments he made to the school in China could be transferred to an affiliated school in another country. Co-Conspirator B promised to look into it.

130. The next day, Claiborne unburdened herself to Co-Conspirator A. "I don't want to have an ongoing relationship with [Co-Conspirator B] and [Co-Conspirator C]. I don't want to be Idebited to anyone but God. This has been too much for me from the beginning and I want to be free of this. I will tell you when I see you. Trust me when I say. So when u see them on Friday I think you should try to bring some type of closure to the whole experience and leave behind the bad Karma. They want me to go to China to tell me more things in person but I won't be going as I can't bear any more bad news. Furthermore I don't feel good about this at all." Two days later, Co-Conspirator A left China for the United States.

131. Once back stateside, Co-Conspirator A emailed Co-Conspirators B and C. He explained that Claiborne was not comfortable with the "particular relationship"[26] that she had developed with Co-Conspirators B and C with respect to his studies in China. According to Co-Conspirator A, Claiborne didn't "want to feel burdened or indebted and it seems her worries are very great." While acknowledging his gratitude for their help, Co-Conspirator A vowed to blaze his own way forward.

132. On or about August 21, Claiborne and Co-Conspirator A conversed about Co-Conspirator A's communications with Co-Conspirators B and C. Claiborne suggested that Co-Conspirator A talk with Co-Conspirator B via Skype.

133. On or about September 10, 2013, Co-Conspirator A wrote to Co-Conspirators B and C requesting a reference letter to help him secure a position in Korea teaching English. Co-Conspirator C contacted Claiborne, promising, "[S]urely we will help."

134. In an October 6, 2013 email to Co-Conspirator B, Co-Conspirator A mused, "[redacted], you can see what [Claiborne] has had to find for herself a way to be stable and to also help us."

135. Co-Conspirator C emailed Claiborne on or about November 11, 2013, offering, "Anything we can do from here, please let me know." Co-Conspirator C then inquired about Claiborne's job, asking "Is the work hard there, is it still very tense? Anything interesting, please share with us." Co-Conspirator C then reminded Claiborne that "it's been a year since you left and many things have happened. We miss you very much." Co-Conspirator C asked, "Do you have a plan for a vacation? If possible, we would like to meet you." Claiborne responded, "If my travel allowance is enough, I will come to China."

---

[26] The email was entirely in English, except for the word "关系," which was in Mandarin. An FBI linguist interpreted the Mandarin to mean "relationship, relations, connection."

136. Later that day, Claiborne warned Co-Conspirator A that Co-Conspirator C had contacted her. Claiborne said, "I don't want them to be involved in your every move and details . . . You'll understand one day."

137. On or about December 2, 2013, Co-Conspirator C contacted Claiborne again, saying, "Anything we can do from our side, let me know." Co-Conspirator C assured Claiborne that, "As you know, we do want to meet here in China and we will arrange everything."

**2014**

138. Co-Conspirator C sent New Year's greetings to Claiborne in January 2014, reminding her that "Anything we can do here, please let us know."

139. On or about January 17, 2014, Co-Conspirator A flew to Beijing. Four days later he emailed Co-Conspirator B, saying, "I don't want to ask but could I please borrow 1000RMB."[27]

140. On or about February 3, 2014, Co-Conspirator A emailed Co-Conspirators B and C, "Tomorrow I will arrive in Shanghai. [Co-Conspirator C] the ICBC bank card for some reason doesn't work, I will go to ISBC [sic] to figure out what is the problem. . . The reason I wanted to borrow some funds is because I will soon have none."

141. On or about February 22, 2014, Co-Conspirator C informed Claiborne that Co-Conspirator A was "financially tight, so we wired 5000 Yuan[28] to him to offer a little help. Of course, if he needs cash in the coming months, we will be happy to give a hand." He then told Claiborne that "me and [Co-Conspirator B] are planning a business tour in Africa in a couple of months, visiting some interesting places and exploring business opportunities there. We will certainly stop in East Africa, Sudan or Kenya, most likely. If possible we would like to visit you there. And if you have time, you can join us for a vacation."

---

[27] Approximately $165.40.

[28] Approximately $826.31.

142. On or about March 17, 2014, Claiborne emailed Co-Conspirator A, "Read your Skype message ASAP then delete the history."

143. On or about March 20, 2014, Co-Conspirator C contacted Claiborne, saying, "Me and [Co-Conspirator B] are planning to Africa this April or May before it's too hot. . . We do hope that you will be around Khartoum that time." Claiborne responded, "I will not be traveling back to Sudan I will stay in the states. I'm happy about my decision. Taking on a different path. I'm sure is is okay."

144. On or about April 8, 2014, Co-Conspirator B emailed Claiborne, "If everything smooth, we should be in Africa beginning of may. By the way, what we should do for [Co-Conspirator A]? Sometimes ago he wrote to me by Skype that he may move back to shanghai. . . Please talk with him and let me know if I should do something." Claiborne replied, "I thought [Co-Conspirator C] told you. I am taking on a new position in Washington then I will retire. It's all for the best. Good luck on your trip to Africa."

145. The next day, Claiborne wrote to Co-Conspirator A. "We need to talk under no circumstances are u to communicate my where abouts to [Co-Conspirators B and C] I told you that before. I don't know why you continue to seek their assistance and then get me dragged into this." Co-Conspirator A wrote back, "The fact that [Co-Conspirator B] has reached out to you has nothing to do with me. Your email sounds panicked. . . [Co-Conspirator B] reaching out to you is of his own will. Why you keep saying I'm dragging you into something is beyond me. . . Whatever it is you all have to clear up, should be cleared up without me being n the middle of it."

146. On or about May 13, 2014, Co-Conspirator A notified Claiborne that Co-Conspirator C had emailed him. Co-Conspirator A requested Claiborne's guidance on how to respond. Claiborne initially responded, "don't answer." She then added that if Co-Conspirator A felt he needed to communicate with them, "just don't mention anything about me . . . as far as you

know I'm in DC . . . that's all you know . . . don't tell them anything about your plans."[29] Claiborne admonished Co-Conspirator A not to ask for their assistance and to refrain from contacting them until Co-Conspirator A was ready to leave the country.

147. Co-Conspirator A followed the letter, if not the spirit, of Claiborne's instructions, refraining from making contact with Co-Conspirators B and C until May 29, the day he left China. In his email, however, Co-Conspirator A "apologized for all the ignored calls and texts," explaining, "It's complicated" and "I wasn't allowed" and "Know that it was not my choice to ignore you."

148. On or about June 2, 2014, Co-Conspirator B responded, copying Co-Conspirator C, saying, "Hi I knew you will back to home end of may. That's why [Co-Conspirator C] want to give you some money for back home."

149. On or about August 17, 2014, Claiborne emailed Co-Conspirators B and C. She extended her "sincere thanks for always being there for [Co-Conspirator A] and for extending welcoming hospitality to us during our stay in China." She observed that "We really had some good times and good food." Regarding work, Claiborne said she was "trying to get a posting in Taiwan or India next year." As for Claiborne's finances, "One thing is for sure I need to go back abroad to pay off all this debt I have accrued here in Wash (smile)." Claiborne signed the email as "Kangdai," her Chinese name. [30]

150. Having recently returned to Khartoum, Sudan, Claiborne, on or about October 26, 2014, electronically submitted through e-QIP her completed SF-86 questionnaire for her national security clearance background check. Section 19, entitled "Foreign Contacts," asked, "Do you

---

[29] At the time, Claiborne was in Khartoum, Sudan.

[30] On or about December 9, 2008, Claiborne created the email address ctranquility@gmail.com. The name provided for the account was C. Marie, with the nickname "Ms. Kang." Additionally, Claiborne's iCloud account includes "Kang Dai" in the name.

have, or have you had, close and/or continuing contact with a foreign national within the last seven (7) years with whom you, or your spouse, or cohabitant are bound by affection, influence, common interests, and/or obligation?" Claiborne answered, "No."

151. Section 20B, entitled "Foreign Business, Professional Activities, and Foreign Government Contacts, asked, in relevant part under the subheading "Foreign Government Contact," whether during the past seven years Claiborne or anyone in her immediate family "had any contact with a foreign government, its establishment (such as embassy, consulate, agency, military service, intelligence or security service, etc.) or its representatives, whether inside or outside the U.S.?" [redacted]. Claiborne answered, "No."

152. Before submitting the SF-86, Claiborne certified as follows: "My statements on this form, and on any attachments to it, are true, complete, and correct to the best of my knowledge and belief and are made in good faith. I have carefully read the foregoing instructions to complete this form. I understand that a knowing and willful false statement on this form can be punished by fine or imprisonment or both (18 U.S.C. 1001). I understand that intentionally withholding, misrepresenting, or falsifying information may have a negative effect on my security clearance, employment prospects, or job status, up to and including denial or revocation of my security clearance, or my removal and debarment from Federal service."

153. The SF-86 instructions page also warned Claiborne that "All questions on this form must be answered completely and truthfully in order that the Government may make the determinations described below on a complete record. Penalties for inaccurate or false statements are discussed below." In the section entitled "Penalties for Inaccurate or False Statement," the instructions advised, "The U.S. Criminal Code (title 18, section 1001) provides that knowingly

falsifying or concealing a material fact is a felony which may result in fines and/or up to (5) years imprisonment."

154. The instructions further stated, "This form will be used by the United States (U.S.) government in conducting background investigations, reinvestigations, and continuous evaluations of persons under consideration for, or retention of, national security positions."

155. Finally, under the section of the SF-86 entitled "Statement of understanding," Claiborne affirmatively answered that "I have read the instructions and I understand that if I withhold, misrepresent, or falsify information on this form, I am subject to the penalties for inaccurate or false statement[s] (per U.S. Criminal Code, Title 18, section 1001)."

156. On or about November 3, 2014, Co-Conspirator B emailed Claiborne about Co-Conspirator A, stating that "we can do nothing for him if he is not in china. We believe that we should not give him up." Claiborne replied, "Personally, I don't want him to go back to China." She also inquired about Co-Conspirator C, asking, "Is he still working with you? Will he take over your business some day?"

157. After her exchange with Co-Conspirator B, Claiborne wrote to Co-Conspirator A, informing him of the communication. She then confided, "I actually meant to tell you something while I was home, but I forgot and I don't want to email it or speak over the phone. I will send you a letter so you will know how I feel about your connection to [Co-Conspirator B] and [Co-Conspirator C]. 10/4. I don't want them to know anything about my whereabouts overseas. If they ask you, I'm doing fine and working on projects here and there. That's it."

158. On or about December 20, 2014, Co-Conspirator A emailed Co-Conspirator B, saying, "I haven't heard from you in quite some time. I am starting to think [Claiborne] said not to contact me." Co-Conspirator A then conveyed that he was "really needing some help with my Shanghai Banking."

**2015**

159. On or about February 3, 2015, Co-Conspirator A departed the United States for Africa.

160. On February 26, Co-Conspirator A emailed Co-Conspirator B from Africa, noting that he would soon be visiting China.

161. On or about July 10, 2015, FBI agents conducted a court-authorized search of a storage facility containing Claiborne's belongings. Inside, they found a journal in which Claiborne had written, "[Co-Conspirator B]: Business plan, Generate 20k in 1 year."[31] Claiborne also wrote, "Clean up yahoo email contacts." Claiborne used a Yahoo email address as one means to communicate with Co-Conspirators B and C.

162. On or about July 14, 2015, Claiborne informed Co-Conspirator B that she would be in Beijing for a quick visit that week, and that she would try to call him.

163. Claiborne traveled to Beijing on or about July 16, 2015, staying in China through on or about July 27. On or about July 19, she emailed Co-Conspirator A, requesting, "Please communicate with me thru yahoo, viper, what's app, we chat, apple." Before leaving the U.S., Claiborne was brought into secondary by Customs and Border Patrol (CBP) agents, where her bags were inspected.

164. On or about September 1, 2015, Claiborne, having recently returned from China where she apparently met with Co-Conspirator B,[32] emailed Co-Conspirator B her USAA bank account information, saying, "I thought I would go ahead and send you this . . . if that's ok. I'll call u tomorrow."

---

[31] Claiborne once told a friend that green was her favorite color because it was the "color of money."

[32] On or about October 4, 2015, Co-Conspirator A emailed Co-Conspirator B, saying, "[Claiborne] said she met with you on her last trip to Shanghai."

165. On or about September 5, Claiborne wrote, "Hi [Co-Conspirator B], hope all is well. Just wanted to know if you will be able to help me out." The subject line of the email was "Home repairs." Co-Conspirator B responded, "Hi Candace, we are on holiday these days. Can you inform me clearly the 5k to which account?"

166. The next day, Claiborne wrote back to Co-Conspirator B, provided her USAA account information, and said, "I'm sorry to disturb you while on vacation I didn't know. You can send it to my checking acct which is below. Are you in Europe? Enjoy yourself. I can wait until you return. I start school for Spanish training this week."

167. On or about September 8, 2015, Claiborne received an email from the Department of State about scheduling an appointment for her background investigation interview. The email, from Patricia Crampton, a contract Special Investigator with the Bureau of Diplomatic Security, noted that Claiborne "didn't list any foreign contacts or foreign travel" in her SF-86. Crampton requested that "if there is anyone or any trip that you have forgotten please use the attached templates to provide that information." Claiborne responded, attaching supplemental foreign contact and foreign travel information, saying, "I started this process so long ago. Sorry I don't remember these achievements. I have filled them out to the best of my knowledge. I am not sure of what your definition of foreign contacts are."

168. For her supplemental foreign contacts, Claiborne listed an education professor in China, a retired martial arts teacher in China, and an executive assistant to the ambassador at the Barbados Embassy in China. She did not list Chinese nationals and PRCIS agents Co-Conspirators B and C.

169. Claiborne also contacted the education professor in China. She wrote, "Hi I am doing my security clearance... someone may contact you by email. i said that I have met you since

2000.. we are colleagues/friends… we contact one another by email occasionally…thats all… you showed me around beijing during my first stay… nothing more…and that's the truth!"

170. On or about September 9, Claiborne contacted [redacted], a retired FBI agent. Claiborne talked about how, unlike last time she went through her background check, this time the investigator was a contractor. Claiborne asked whether the background investigators have prior security/agent/police experience. Regarding foreign contacts, Claiborne said, "I know all kinds of people . . . what the hell." [redacted] explained that the investigators were interested in regular and continuing foreign contacts.

171. That same day, Claiborne called Co-Conspirator A and asked him how to delete her WeChat account.[33] Claiborne also emailed Co-Conspirator B, writing, "Very busy this week I have language orientation and my security clearance interview so I'm putting everything on hold until that's cleared."

172. On or about September 10, 2015, Crampton interviewed Claiborne. Crampton underwent a "point-by-point review" of the security forms with Claiborne. Despite being warned at the start of the interview that "18 USC 1001 makes it a crime to knowingly falsify or conceal material facts related to this investigation," Claiborne, during the interview, made a number of materially false statements or omissions:

- Claiborne claimed that Co-Conspirator A's only trip out of the country was a pleasure trip to Africa. Claiborne mentioned nothing about Co-Conspirator A's extensive travels and stays in China, including his year living in Shanghai housing provided by Chinese nationals and PRCIS agents Co-Conspirators B and C.

[33] WeChat is a Chinese-based communications app. According to Claiborne, she used her WeChat account to communicate with "them, the China experts."

- Claiborne denied accepting financial support from any person or entity outside of her employment.
- Claiborne claimed she had no "close ties of affection or obligation" to a citizen or resident of a foreign country, other than those she had listed (which did not include Co-Conspirators B and C).
- Despite making no mention of Co-Conspirators B and C, Claiborne denied failing to report any contacts with foreign nationals. Claiborne specifically averred that she maintained no contact with any foreign nationals, including through any social media, including Snapchat, Skype, or Facebook.
- Claiborne denied that any foreign contact had ever asked for "special favors" or had any influence over her. Claiborne stated that no foreign contact had ever asked probing questions about her work, asked her to participate in a clandestine meeting, or introduced her to members of a foreign intelligence agency or government.
- Claiborne asserted that she had no "unauthorized association with a suspected or known collaborator or employee of a foreign intelligence service ["FIS"] and Claiborne [had] no knowledge or suspicions of ever having been a target of interest of a FIS."
- Claiborne denied accepting any "educational, medical, or other benefits . . . from a foreign country"
- Claiborne said that she had not "deliberately omitted, concealed, or falsified relevant and material facts from any personnel security questionnaire, personal history statement, or similar form used to conduct investigations . . . [or] determine security clearance eligibility or trustworthiness."

- Claiborne asserted she had not "deliberately provided false or misleading information concerning relevant and material matters to [any representative] in connection with a personnel security or trustworthiness determination."

173. On or about September 11, 2015, Claiborne asked Crampton by email, "When will I be informed about the completion of my clearance?"

174. That same day, Claiborne called Co-Conspirator A, who was living in Claiborne's house in Washington, D.C., to tell him about her security clearance interview. She complained about how many questions she was asked, [redacted]. She wrote, "In particular they ask like if [redacted] have like traveled abroad." Claiborne told Co-Conspirator A that she said he had only gone to Africa. While she didn't think Co-Conspirator A would be contacted, she made sure he knew that she "didn't say anything about . . . um . . . ya know," referring to China. Claiborne said she'd tell him more when she saw him. Claiborne also acknowledged that if she wasn't fully forthcoming, she could lose her job.

175. On or about September 13, 2015, Co-Conspirator B emailed Claiborne, asking, "did everything clear now?" Claiborne immediately responded, "Clear all messages please. Everything below . . ."

176. Also on or about September 13, Claiborne called a friend (Witness 1) who also knew Co-Conspirator B. Claiborne told Witness 1 that she had just had her security clearance interview. According to Claiborne, the interview was complicated and troublesome. Claiborne particularly vented about being questioned about friends overseas. Claiborne further complained about how much information was requested about [redacted]. Claiborne told Witness 1 that if your story isn't straight and clear, the questioner keeps probing and checking. Claiborne reported that there were a lot of questions about an overseas friend with whom she communicated via social

media. Claiborne noted that this process repeats itself every five years, but this will be her last time since she will retire before the next investigation.

177. On the same day, Claiborne called Geotelecom customer service to learn how to dial a cell phone number in China using her calling card. Claiborne then made a phone call to Co-Conspirator B using her calling card.[34] The call was placed at 9:42 a.m. eastern time (which would be 9:42 p.m. in China). Claiborne first introduced herself as Candace, but then switched to Kangdai, her Chinese name. She apologized for calling so late. Co-Conspirator B asked whether everything was alright. Claiborne responded, "Yes. I want to say yes, so. I didn't want to email because now . . . it, it take a while for the whole process to be finish." Claiborne elaborated, "They ask, oh so many questions. You have no idea." Co-Conspirator B responded, "So, so, so I can't transfer the 5k to your that . . . to the account?" Claiborne replied, "No, no, no, no, no. No, no, no, no, no."

178. Claiborne said, "I will tell you a little later. You know when it's all, when it's all finished." Co-Conspirator B responded, "Okay, okay, no problem. . . I will wait." Claiborne explained, "cause they, they check into it, everything, your taxes, your, oh, everything, your foreign travel, your foreign contact." She then said, "M-hmm, trouble, very big trouble." Co-Conspirator B clarified, "So, it's not yet finished, right?" Claiborne confirmed that was right.

179. Claiborne continued, "Every five years, we have to do this, even though. But, now, they change, they want to know about your foreign travel. Where did you go? Who did you meet?" Co-Conspirator B noted, "A lot of questions." Claiborne agreed, observing, "This is too excessive. Really, even [redacted] . . Now, they ask what [redacted] did when they went overseas."

[34] Claiborne first dialed 202-657-0294, a number associated with the calling card. Claiborne then entered her PIN, followed by the number 86-136-019-405-79, which is listed in Claiborne's Apple iPod Touch as the cell phone number for Co-Conspirator B.

Co-Conspirator B said, "Now, I understand. . . No problem. Uh… when it's over, you let me know. Then, I can do. Okay?" Claiborne affirmed, "Good."

180. Claiborne closed the conversation, saying, "So, I just cleaned, cleaned up all my emails and stuff. You know, delete, delete, delete." Co-Conspirator B responded, "Good, understand."

**<u>2016</u>**

181. On or about February 23, 2016, the Department of State informed Claiborne that her background check was completed. Specifically, the message read, "[Y]ou have been successfully granted continued access eligibility to classified information up to and including the TOP SECRET level based upon a Single Scope Background Investigation – Periodic Reinvestigation (SSBI-PR) completed on 02/23/2016. Your next SSBI-PR will be initiated in approximately December 2020."

182. On or about March 5, 2016, Co-Conspirator A emailed five people, including Co-Conspirators B and C, requesting a letter of recommendation for an educational program.

183. On or about April 1, 2016, Claiborne received a reminder from birthdayalarm.com about Co-Conspirator B's 50th birthday on April 4. Claiborne forwarded the reminder to Co-Conspirator A, saying, "Send a card to [Co-Conspirator B]." Co-Conspirator A responded, "Who is [Co-Conspirator B]?" Claiborne replied, "[Co-Conspirator B] from Shanghai."

184. On or about June 7, 2016, Co-Conspirator A traveled again to China. He remained there until July 14.

185. After Co-Conspirator A boarded the plane for China, he spoke by phone with Claiborne. Co-Conspirator A told Claiborne he would set up WeChat once he arrived. Claiborne instructed Co-Conspirator A, "If you happen to talk to [Co-Conspirator B] or any of them, just say… [Claiborne] is working in D.C. I'm sure they'll ask – they're spies."

186. On or about July 12, 2016, Co-Conspirator B emailed Claiborne, "Hi Candace, long time no see! How is life in DC? Found [Co-Conspirator A] is back in Shanghai? What do you want me to do for him?" Claiborne responded, thanking Co-Conspirator B for the offer, but saying, "I don't need you to do anything for [Co-Conspirator A]."

187. That same day, Claiborne asked Co-Conspirator A whether he had seen Co-Conspirators B or C. Co-Conspirator A answered that he had not.

188. During Co-Conspirator A's reentry to the United States, he was questioned by a CBP agent, along with the undersigned affiant. Co-Conspirator A said that he had been to China many times, but denied having ever lived anywhere other than Beijing. (Co-Conspirator B omitted that he had lived in Shanghai for a year at the expense of PRCIS agents Co-Conspirators B and C).

189. On or about July 20, 2016, Claiborne returned from a short trip to Vienna, Austria. During reentry at Dulles Airport, she was pulled into secondary, where her bags were searched outside of her presence. Claiborne was very upset, and filed a complaint with CBP. In response, an FBI special agent contacted Claiborne regarding the complaint. The special agent arranged an interview with Claiborne for August 23 at the FBI's Washington Field Office Headquarters in Washington, D.C.

190. On or about July 28, 2016, Claiborne obtained a new iPhone at an Apple store, complaining that her old phone had been out of her sight for a couple of hours at the airport.

191. August 19, 2016 was Co-Conspirator A's birthday. Claiborne called Co-Conspirator A, wishing him a happy birthday.

192. On or about August 23, 2016, Claiborne participated in a voluntary interview at the FBI's Washington Field Office with FBI Special Agent Kendra McLamb and Metropolitan Police Department Detective and Joint Terrorism Task Force Officer Norma Horne. The interview was recorded, and a transcript was subsequently made.

193. At the outset of the interview, Special Agent McLamb advised Claiborne of the voluntary nature of the interview. According to Special Agent McLamb, investigators were still early in their investigation, but they were "trying to find out what's going on with CBP," including possible patterns of wrongdoing. Special Agent McLamb warned Claiborne that "it's a crime to lie to federal agents."

194. Regarding her most recent trip to China (summer 2015), Claiborne claimed that she did not meet with any foreign government officials. By contrast, in October 2015, Co-Conspirator A emailed PRCIS agent Co-Conspirator B saying, "[Claiborne] said she met with you on her last trip to Shanghai."

195. When asked whether she maintained contact with any Chinese foreign nationals, Claiborne omitted any mention of Co-Conspirators B and C.

196. When asked directly whether she "ever had contact with representatives of any foreign entity or intelligence agency while either overseas or here in the U.S.," Claiborne responded, "No," adding, "those are the same things we have to report in our clearance."

197. Claiborne falsely denied that [redacted] maintain contacts with any Chinese government officials. She omitted any reference to Co-Conspirator A's connections with PRCIS agents Co-Conspirators B and C. When asked if Co-Conspirator A still travels, Claiborne responded, "Well, he's in California now. He was in DC last year, and he's in California. I don't know what he's doing exactly. He's trying to go back to school." Claiborne did not mention that she knew Co-Conspirator A had just returned from China the previous month.

198. Claiborne acknowledged that Co-Conspirator A had attended fashion school in China, but misrepresented how his education was funded. When asked directly, "Who paid for that?" Claiborne responded, "I think he paid for it. . . I think he had like some kind of scholarship."

Claiborne said nothing about Co-Conspirators B and C providing the tuition payments, housing costs, and living expenses for Co-Conspirator A.

199. Claiborne falsely stated that no one had ever offered to provide travel benefits for her other than the U.S. government.

200. Claiborne additionally falsely denied having ever been offered any "gifts, benefits, money" by a foreign national. Claiborne volunteered, "That's the kind of stuff we have to report."

201. The interview concluded at approximately 1:00 p.m., after which Claiborne returned to work at the Department of State building in Washington, D.C. At approximately 4:08 p.m., she left her desk. At 4:15 p.m., she called Co-Conspirator A from her cell phone. She asked him if he had received a scholarship when attending the fashion school in China. Co-Conspirator A responded, "Not that I know of." Claiborne falsely insisted otherwise, saying, "You did! You did! Uh-huh, yeah, yeah."

202. From approximately 4:17 to 4:20 p.m., Claiborne placed two calls to a friend. Then at approximately 4:22 p.m., she called Co-Conspirator A again, but this time not from her cell phone or from her desk phone, but from a phone booth located three floors below Claiborne's office.

203. Claiborne told Co-Conspirator A that CBP had previously stopped her, searched her bags, and asked questions. Claiborne then explained how earlier that day, the FBI asked questions about where she had been and why. Claiborne relayed to Co-Conspirator A that she told the FBI she had not taken money or gifts, and that Co-Conspirator A had been on scholarship while at the art school. According to Claiborne, she told the FBI that [redacted] had done anything that might have drawn attention to them or to her.

204. Claiborne explained to Co-Conspirator A that during a national security clearance investigation, a lot of questions get asked [redacted] because of the clearance you hold and

the access you have to certain documents. As a result, Co-Conspirator A needed to be careful with what he said and did, because his actions could lead back to Claiborne.

205. Co-Conspirator A told Claiborne, apparently for the first time, that he too was stopped by CBP after his most recent trip to China. CBP searched his belongings outside his presence and required him to unlock his phone, just as they had done with Claiborne. This information prompted Claiborne to express concern and speculate that CBP's actions had something to do with their visits to China, and that they should "stay away from that for now."

206. Claiborne asked Co-Conspirator A when he studied in China, to which Co-Conspirator A answered 2012 to 2013. Claiborne reiterated her point from the earlier call that Co-Conspirator A was "on scholarship, and they paid for your housing," expressing that she did not want any trouble. After the call, Claiborne returned to her desk at approximately 4:46 p.m.

207. That evening, Claiborne called Co-Conspirator A again. The call once more was focused on the CBP searches in light of the FBI interview earlier that day. Claiborne asked Co-Conspirator A more specific questions about his recent stop by CBP, including about the questions CBP asked and about the search of his electronics.

208. Claiborne expressed to Co-Conspirator A that "you don't really know what to think, you know, who to trust." Claiborne warned Co-Conspirator A that a person's words could be used against that person at some point. Claiborne was uncomfortable with CBP going through her iPhone, so she got a new phone. Claiborne advised Co-Conspirator A to clean his "stuff up," and to be mindful of his words and actions.

209. That same evening, Claiborne emailed Co-Conspirator A, writing, "I'm sorry u were harassed at airport. U should have told me. When are you coming home for a visit? Be mindful and clean up your computer, Facebook etc. People will hunt for anything."

210. The next day, on or about August 24, 2016, Claiborne sent Co-Conspirator A an e-card message using the service Birthday Alarm. The message's subject was "Happy Birthday," even though Co-Conspirator A's birthday occurred five days before, and Claiborne had conveyed birthday greetings by phone to Co-Conspirator A on his actual birthday. The message, however, had little to do with Co-Conspirator A's birthday. To the contrary, it read, "I hope you enjoyed your day. May Allah bless you with health and happiness. Btw delete all email messages and contact information in your email and phone pertaining to [Co-Conspirator B] and [Co-Conspirator C] – I don't want any trouble going forward ok – please do this immediately! Messages, nos, anything having to do with that fashion school your apartment anything – even from wechat, fb, skype, etc u got me?"

211. That same day, Claiborne asked a T-Mobile representative whether it was possible to batch delete numbers from an iPhone 6s.

**2017**

212. On January 26, 2017, an ethnically Chinese FBI undercover agent whom Claiborne did not know met with Claiborne. The agent was standing outside Claiborne's home in Washington, D.C. when Claiborne returned from work. It was cold and dark outside. Nevertheless, Claiborne admitted the stranger into her home after he described himself as "[Co-Conspirator C] and [Co-Conspirator B]'s colleague."

213. Over the next 1.5 hours, Claiborne and the undercover agent engaged in a wide-ranging conversation. The agent, explaining that he worked for the MSS and that Co-Conspirators B and C were with the SSSB, stated that the MSS considered Claiborne to be one of its "highest regarded" friends.

214. The undercover agent went further, thanking Claiborne, on behalf of the MSS, for her past assistance. Claiborne did not deny this assistance, but did refuse to continue providing

assistance or receiving benefits, including cash proffered on the spot by the agent. As Claiborne articulated, "things are not the way they used to be." Rather, she now had "to do security stuff all the time." In particular, she had been asked "just way too many questions" about "travels" and "foreign contacts." Moreover, Claiborne complained that during national security clearance investigations, "they ask us about this kinda stuff . . . like your relationship with foreign governments."

215. The undercover agent requested, and Claiborne agreed, that their conversation would not be reported, in violation of State Department requirements.

216. On March 28, 2017, Claiborne returned to the FBI field office in Washington, D.C. for a second voluntary interview. Although Claiborne claimed that her relationship with Co-Conspirator B began as a friendship, she acknowledged eventually realizing that Co-Conspirators B and C were seeking information on behalf of the PRC government.

217. During the interview, Claiborne also acknowledged that Co-Conspirators B and C asked her questions about internal U.S. Government perspectives on contemporary issues of relevance to U.S – China relations. Claiborne admitted to passing information to Co-Conspirators B and C, both orally and in writing, but insisted she always provided unclassified information.

218. Referring to her journal entry about making $20,000 in one year working with Co-Conspirator B, Claiborne admitted that she thought, through her relationship with Co-Conspirator B, that she could make extra money to pay for her expenses. She said that she looked for unclassified reporting, including about economic matters, to provide to Co-Conspirators B and C. She also recalled, in response to a specific tasking, providing Co-Conspirators B and C with information about a dissident who was being secretly housed at the embassy.

219. Claiborne confirmed that Co-Conspirators B and C paid for Co-Conspirator A's tuition and housing in Shanghai, along with a stipend. Because Co-Conspirators B and C were

helping Co-Conspirator A, Claiborne felt that she should "tell[] them something, but nothing compromising." Claiborne said that Co-Conspirator C gave her cash one year for Chinese New Year's, and provided Co-Conspirator A with a free laptop. Claiborne said she felt uncomfortable about her relationship with Co-Conspirators B and C because "when someone does something for you, they always want something in return."

220. Claiborne admitted that she should have reported to State Department officials her contacts with Co-Conspirators B and C, but she said that she was concerned about the consequences for Co-Conspirator A and herself.

## CHARGES

**False Statements – 18 U.S.C. § 1001**

221. Based on the facts set forth above, there is probable cause to believe that Claiborne made numerous materially false statements during the interview with FBI agents on August 23, 2016 in Washington, D.C. After being warned that it was a "crime to lie to federal agents," Claiborne knowingly and willfully made materially false statements to FBI investigators about her contacts with foreign nationals, including by:

- claiming that Co-Conspirator A attended fashion school in China on scholarship;
- omitting Co-Conspirators B and C from her list of Chinese foreign nationals with whom she maintained contact;
- claiming that she never received any "gifts, benefits, or money" from a foreign national during her travels;
- claiming that she had no "contact with representatives of any foreign entity or intelligence agency while either overseas or here in the U.S.";
- claiming that no one other than the United States government had ever offered to provide her with travel benefits.

**Conspiracy to Obstruct an Official Proceeding – 18 U.S.C. § 1512(b) and (c) and (k)**

222. Based on the facts set forth above, there is probable cause to believe that Claiborne and Co-Conspirator A conspired with Chinese nationals and PRCIS agents Co-Conspirators B and C to corruptly influence, obstruct, or impede a pending official proceeding before the Department of State, when they conspired to conceal Claiborne's and Co-Conspirator A's unreported contacts with Co-Conspirators B and C during the State Department's most recent national security clearance background investigation of Claiborne. The object of the conspiracy was to prevent State Department background investigators from learning about Claiborne's unreported foreign entanglements so that Claiborne could fraudulently maintain her TOP SECRET clearance and State Department employment.

223. While in Khartoum, Sudan, Claiborne submitted an SF-86 national security questionnaire via a proxy server with an IP address that resolves to Washington, D.C.[35] Claiborne, intending to mislead investigators, knowingly and willfully transmitted the questionnaire with material omissions in her answers. Specifically, Claiborne knowingly omitted any reference to Co-Conspirators B and C in Section 19, entitled, "Foreign Contacts." She also omitted any mention of Co-Conspirators B and C in Section 20B, under the subheading entitled, "Foreign Government Contact." Claiborne made these material omissions despite affirming that she had read the instructions and that her answers on the SF-86 would be "used by the United States (U.S.) government in conducting background investigations, reinvestigations, and continuous evaluations of persons under consideration for, or retention of, national security positions."

224. Claiborne's omissions were not surprising, since Claiborne and Co-Conspirators B and C had long undertaken operational security efforts to keep their communications concealed. As early as May 2011, when Co-Conspirator B tasked Claiborne to provide internal U.S.

[35] The actual server appears to be located in Maryland.

government analysis on economic policy, Co-Conspirator B dissuaded Claiborne from providing responsive information by email "bcs others also can catch it with Internet." And Claiborne later confessed to Witness 1 that to communicate with "them, the China experts," Claiborne relied on WeChat, a Chinese-based social media app.

225. In September 2015, Claiborne and Co-Conspirator B continued their efforts to conceal from State Department investigators their secret correspondence and the unreported gifts and benefits provided to Claiborne and Co-conspirator A by Co-Conspirators B and C. Indeed, Claiborne had just requested $5,000 from Co-Conspirator B, who had agreed to transfer the funds to her. Yet as a direct response to the State Department background investigation, Claiborne and Co-Conspirator B conspired and agreed to delay transfer of the money to Claiborne for the purpose of concealing the transaction from background investigators.

226. On September 1, 2015, Claiborne sent her USAA bank account information to Co-Conspirator B. A few days later, Claiborne emailed Co-Conspirator B again, requesting $5,000 for "home repairs." Co-Conspirator B, willing to provide the money, wanted additional account information for Claiborne, which she promptly provided.

227. Everything was on track for the transfer of the funds until September 8, when Claiborne was contacted about her SF-86, which she had submitted almost a year before. The background investigator noted that Claiborne failed to list any foreign contacts, and offered Claiborne another chance to do so. An in-person interview was scheduled for the 10th, just two days later. Alarmed, Claiborne notified Co-Conspirator B that she was about to have her "security clearance interview" and that she was "putting everything on hold until that's cleared." During that interview, Claiborne was asked "oh so many questions," as she told Co-Conspirator B shortly afterwards. Despite all the questions, many of which focused on her foreign contacts, Claiborne mentioned nothing about Co-Conspirators B and C, the previous gifts they had provided to

Claiborne and Co-Conspirator A, or the $5,000 she had requested from Co-Conspirator B just five days before the interview. Instead, she willfully and knowingly made numerous materially false statements, as documented in detail in the timeline above.

228. The next day, Claiborne called Co-Conspirator A, who was then living in Washington, D.C. at Claiborne's D.C. residence, to discuss her interview. During that call, Claiborne informed Co-Conspirator A that she told the investigator, in response to a question about where [redacted] had traveled abroad, that Co-Conspirator A had only traveled to Africa. Although Claiborne doubted that Co-Conspirator A would be contacted, she wanted to make sure that he knew that Claiborne "didn't say anything about . . . um . . .ya know," referring to the fact that Claiborne concealed all information about Co-Conspirator A's extensive travels and stays in China. Claiborne did so to corruptly ensure that Co-Conspirator A's story would match her own if he was interviewed by an investigator.

229. Three days after the interview with the State Department background investigator, Co-Conspirator B inquired, "did everything clear now," referring to the investigation. Claiborne immediately responded, "Clear all messages please. Everything below . . ."

230. Claiborne called Co-Conspirator B that night, referencing the security interview. Co-Conspirator B, perceiving Claiborne's concerns, said, "So I can't transfer the 5k [yet]." Claiborne affirmed, and Co-Conspirator B promised to wait to wire the money until Claiborne's security investigation was "over." Claiborne consented to this arrangement, because "they check into it, everything, your taxes, your, oh, everything, your foreign travel, your foreign contact." Claiborne closed the call by telling Co-Conspirator B she had just "cleaned up all my emails and stuff. You know, delete, delete, delete." Co-Conspirator B responded, "Good, understand."

231. In short, knowing that the Department of State was in the midst of a federal investigatory proceeding concerning Claiborne, and desiring to corruptly impede or obstruct that

proceeding, Claiborne and her co-conspirators willfully and knowingly conspired, agreed, and took substantive actions to deceptively alter their behavior and communications to avoid detection and to delete incriminating evidence.

## CONCLUSION AND SEALING REQUEST

232. For all the reasons stated above, there is probable cause to believe that Claiborne made materially false statements to federal law enforcement officers, in violation of 18 U.S.C. §1001, and conspired with Co-Conspirators A, B, and C to obstruct an official proceeding, in violation of 18 U.S.C. §1512. These criminal violations were either begun or committed in Washington, D.C., where Claiborne resides and works, and where the Department of State is headquartered, or were begun or committed overseas, out of the jurisdiction of any particular state or district.

233. I ask that this affidavit be sealed, until further order of the court, to protect this investigation. I am aware from my training and experience that evidence is destroyed, individuals flee, and witnesses may be tampered with or become uncooperative when the details known to law enforcement become prematurely available to the targets of a criminal investigation.

234. I declare under the penalty of perjury that the information provided above is true and correct.

Respectfully submitted,

________________________________________

Kellie R. O'Brien
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on March 28, 2017:

________________________________________

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE